Westlaw.

691 F.2d 1039
691 F.2d 1039
(Cite as: 691 F.2d 1039)

Page 1

H

**Briefs and Other Related Documents**

United States Court of Appeals,
Second Circuit.
SHARON STEEL CORPORATION, Plaintiff-Appellant-Cross Appellee,
v.
The CHASE MANHATTAN BANK, N.A., and Manufacturers Hanover Trust Company, Defendants-Appellees-Cross Appellants.
MANUFACTURERS HANOVER TRUST COMPANY, Third-Party Plaintiff-Appellee-Cross Appellant,
v.
UV INDUSTRIES, INC., Third-Party Defendant-Appellant-Cross Appellee.
CONNECTICUT MUTUAL LIFE INSURANCE COMPANY, et al., Intervenors-Appellees-Cross Appellants,
v.
SHARON STEEL CORPORATION, Plaintiff-Appellant-Cross Appellee,
and
UV Industries, Inc., Third-Party Defendant-Appellant-Cross Appellee.
UNION PLANTERS NATIONAL BANK OF MEMPHIS, as Trustee, Plaintiff-Appellee-Cross Appellant,
v.
UV INDUSTRIES, INC. and David Finkelstein, Arthur R. Gralla, Martin Horwitz, Edwin Jacobson, Theodore W. Kheel, and Paul Kolton, as Trustees of the UV Industries, Inc. Liquidating Trust, Defendants-Appellants-Cross Appellees,
and
Sharon Steel Corporation, Defendant-Appellant-Cross Appellee.
Nos. 720, 926, 1152, 1153, 1154 and 1155, Dockets 81-7664, 81-7682, 81-7674, 81-7692, 81-7694 and 81-7702.

Argued May 10, 1982.
Decided Sept. 28, 1982.

Purchaser corporation commenced action against indenture trustees arising out of their refusal to execute supplemental indentures to allow purchaser to assume liquidating debtor corporation's obligations under indentures and out of their declarations of default thereunder. The United States District Court for the Southern District of New York, Henry F. Werker, J., 521 F.Supp. 104 and 521 F.Supp. 118, granted directed verdict and summary judgment in favor of indenture trustees and intervening holders of debentures and plaintiff appealed. The Court of Appeals, Ralph K. Winter, Circuit Judge, held that: (1) where purchasing corporation acquired only 51 percent of the total assets held by liquidating debtor corporation on the date the plan of liquidation was approved, the successor obligor clauses were not applicable, and liquidating debtor was in default on the indentures and the debentures were due and payable; (2) concerted activity engaged in by indenture trustees who were faced with a common breach of indenture agreements by liquidating debtor corporation and their arrival at a common position as to that breach did not violate the antitrust laws, since there was no anticompetitive purpose or effect in the concerted activity; and (3) where acceleration provisions of indentures were explicitly permissive and not exclusive of other remedies, indenture trustees were not precluded from seeking specific performance of the redemption provisions when liquidating debtor corporation caused the debentures to become due and payable by its voluntary actions.

Affirmed in part and reversed in part.

West Headnotes

[1] Corporations 473
101k473 Most Cited Cases
Successor obligor clauses in indentures are boiler-plate provisions and must be distinguished from contractual provisions which are peculiar to a particular indenture and must be given a consistent, uniform interpretation.

[2] Corporations 473
101k473 Most Cited Cases
Boiler-plate provisions are not the consequence of the relationship of particular borrowers and lenders and do not depend upon particularized intentions of parties to an indenture; there are no adjudicative facts relating to parties to litigation for a jury to find, and the meaning of boiler-plate provisions is a matter of law rather than fact.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

691 F.2d 1039
691 F.2d 1039
(Cite as: 691 F.2d 1039)

Page 2

**[3] Corporations ⚜470**
101k470 Most Cited Cases
In action brought by purchaser corporation against indenture trustees arising out of defendants' refusal to execute supplemental indentures to allow plaintiff to assume liquidating debtor corporation's obligations under indentures, evidence offered by purchaser corporation did not tend to prove a relevant custom or usage or practical construction so as to create a jury issue as to the meaning of successor obligor clauses of indentures.

**[4] Corporations ⚜473**
101k473 Most Cited Cases
Protection for borrowers as well as for lenders may be fairly inferred from the nature of successor obligor clauses in indentures; the former are enabled to sell entire businesses and liquidate, to consolidate or merge with another corporation, or to liquidate their operating assets and enter a new field free of the public debt, and the lenders are assured a degree of continuity of assets.

**[5] Contracts ⚜143(4)**
95k143(4) Most Cited Cases
Where contractual language seems designed to protect the interests of both parties and where conflicting interpretations are argued, the contract should be construed to sacrifice the principal interests of each party as little as possible; interpretation which sacrifices major interests of one of parties while furthering only a marginal interest of the other should be rejected in favor of an interpretation which sacrifices marginal interests of both parties in order to protect their major concerns.

**[6] Corporations ⚜473**
101k473 Most Cited Cases
Boiler-plate successor obligor clauses do not permit assignment of public debt to another party in the course of a liquidation unless "all or substantially all" of assets of the company at the time the plan of liquidation is determined upon are transferred to a single purchaser, and therefore, where purchasing corporation acquired only 51 percent of the total assets held by liquidating debtor corporation on the date the plan of liquidation was approved, the successor obligor clauses were not applicable, and liquidating debtor was in default on the indentures and the debentures were due and payable.

**[7] Monopolies ⚜12(2)**
265k12(2) Most Cited Cases
Concerted activity engaged in by indenture trustees who were faced with a common breach of indenture agreements by liquidating debtor corporation and their arrival at a common position as to that breach did not violate the antitrust laws, since there was no anticompetitive purpose or effect in the concerted activity. Sherman Anti-Trust Act, § 1, 15 U.S.C.A. § 1.

**[8] Specific Performance ⚜4**
358k4 Most Cited Cases
Where acceleration provisions of indentures were explicitly permissive and not exclusive of other remedies, indenture trustees were not precluded from seeking specific performance of the redemption provisions when liquidating debtor corporation caused the debentures to become due and payable by its voluntary actions.

**[9] Corporations ⚜473**
101k473 Most Cited Cases
Liquidating debtor corporation's debenture holders were not entitled to interest earned on a fund which debtor corporation had agreed to establish to secure public debt under indentures, since the indentures did not provide for the payment of additional interest in the event of default and there was nothing in the agreement establishing the fund entitling debenture holders to interest earned on the fund.

**[10] Attorney and Client ⚜155**
45k155 Most Cited Cases
In action brought by purchasing corporation against indenture trustees arising out of defendants' refusal to execute supplemental indentures to allow plaintiff to assume liquidating debtor corporation's obligations under indentures, trial court did not err in granting attorney fees and expenses to debenture holders to be recovered out of the common fund secured by the class they represented, rather than requiring purchasing corporation to pay fees and expenses, since debentures specifically provided for payment of attorney fees and expenses only for litigation brought by indenture trustees.

*1041 Arnold Bauman, New York City (W. Foster Wollen, Stephen A. Oxman, Francis X. Markey, Robert J. Hausen, William J. F. Roll, III, Charles M. Lizza, Shearman & Sterling, New York City, of counsel), for Sharon Steel Corp.

Bruce A. Hecker, New York City (Ronald H. Alenstein, Ronald D. Lefton, Shea & Gould, New York City, of counsel), for UV Industries, Inc. and the Trustees of the UV Industries, Inc. Liquidating Trust.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

691 F.2d 1039
691 F.2d 1039
(Cite as: 691 F.2d 1039)

Page 3

Frank H. Wohl, New York City (Nadia C. Adler, Steven F. Miller, Lee A. Barkan, Rosenman Colin Freund Lewis & Cohen, New York City of counsel), for Connecticut Mut. Life Ins. Co., et al.

Robert C. Myers, New York City (Dewey, Ballantine, Bushby, Palmer & Wood, New York City, of counsel) for The Chase Manhattan Bank, N.A.

Robert Ehrenbard, William A. Krohley, Edward Roberts, III, Paul Lubetkin, Kelly, Drye & Warren, New York City, for Manufacturers Hanover Trust Co.

Donovan, Lesiure, Newton & Irvine, New York City, for Union Planters Nat. Bank of Memphis.

Before FEINBERG, Chief Judge, and NEWMAN and WINTER, Circuit Judges.

RALPH K. WINTER, Circuit Judge:

This is an appeal by Sharon Steel Corp. ("Sharon") and UV Industries, Inc. ("UV"), *1042 trustees of the UV Liquidating Trust (collectively the "UV Defendants") from grants of a directed verdict and summary judgment by the United States District Court for the Southern District of New York (Henry F. Werker, *Judge*) in favor of the Trustees of certain UV indentures ("Indenture Trustees") and intervening holders of debentures issued pursuant to certain of those indentures ("Debentureholders"). In opinions reported at 521 F.Supp. 104 (S.D.N.Y.1981) and 521 F.Supp. 118 (S.D.N.Y.1981), Judge Werker held that UV's liquidation and unsuccessful attempt to assign its public debt to Sharon rendered UV liable for the principal and accrued interest on the debentures. The Indenture Trustees and Debentureholders cross-appeal from other parts of the judgment.

We affirm in part and reverse in part.

### BACKGROUND

1. *The Indentures*

Between 1965 and 1977, UV issued debt instruments pursuant to five separate indentures, the salient terms of which we briefly summarize. In 1965, UV [FN1] issued approximately $23 million of 5 3/8 % subordinated debentures due in 1995, under an indenture naming The Chase Manhattan Bank, N.A. ("Chase") as the trustee ("First Chase Indenture"). The current principal amount of the debentures outstanding under that indenture is approximately $14 million.

> FN1. Until 1973, UV was known as the United Smelting, Refining and Mining Company.

In 1968, the City of Port Huron, Michigan, issued approximately $22 million in Industrial Development Revenue Bonds, bearing 6 1/4 % interest and due in 1993, under an indenture also naming Chase as the trustee ("Second Chase Indenture"). These bonds were issued by Port Huron to raise funds for the construction of a facility to be leased by Mueller Brass Company, a UV subsidiary. The rent paid by Mueller Brass covers the principal and interest on the bonds. Moreover, UV executed an unconditional guaranty of these obligations of its subsidiary ("Chase Lease Guaranty"). The principal amount presently outstanding is approximately $16.5 million.

Similarly, in 1968, the County of Itawamba, Mississippi, issued approximately $13 million in Industrial Development Revenue Bonds due in 1993, under an indenture naming Union Planters National Bank of Memphis as the trustee ("Union Planters Indenture"). These bonds were also issued to fund construction of facilities to be leased by Mueller Brass, the rent payments being sufficient to satisfy the debt service on the bonds. Again, UV guaranteed Mueller Brass' lease obligations ("Union Planters Lease Guaranty"). Approximately $9.78 million principal amount of these Itawamba County bonds remains outstanding.

In 1977, UV issued $75 million of 8 7/8 % debentures due in 1997 under an indenture naming Manufacturers Hanover Trust Company ("Manufacturers") as the trustee ("Manufacturers Indenture"). The principal amount of these debentures has been reduced to approximately $66.78 million. At the same time, UV issued $25 million of 9 1/4 % senior subordinated notes due in 1987 pursuant to an indenture under which United States Trust Company of New York ("U.S. Trust") is the trustee ("U.S. Trust Indenture"). Approximately $16 million principal amount of these notes remains outstanding. [FN2]

> FN2. By stipulation during trial, claims and counterclaims between and among Sharon, the UV defendants and U.S. Trust were dismissed with prejudice.

The debentures, notes and guaranties are general

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

691 F.2d 1039
691 F.2d 1039
(Cite as: 691 F.2d 1039)

Page 4

obligations of UV. Each instrument contains clauses permitting redemption by UV prior to the maturity date, in exchange for payment of a fixed redemption price (which includes principal, accrued interest and a redemption premium) and *1043 clauses allowing acceleration as a non-exclusive remedy in case of a default. [FN3] The First Chase Indenture, [FN4] the Port Huron Lease Guaranty, [FN5] the Union Planters Lease *1044 Guaranty, [FN6] the Manufacturers Indenture [FN7] and the U.S. Trust Indenture [FN8] each contains a "successor obligor" provision allowing UV to assign its debt to a corporate *1045 successor which purchases "all or substantially all" of UV's assets. If the debt is not assigned to such a purchaser, UV must pay off the debt. While the successor obligor clauses vary in language, the parties agree that the differences are not relevant to the outcome of this case.

> FN3. For example, the Manufacturer's Indenture states:
> *Remedies Cumulative and Continuing.* All powers and remedies given by this Article Six to the Trustee or to the Debentureholders shall, to the extent permitted by law, be deemed cumulative and not exclusive of any thereof or of any other powers and remedies available to the Trustee or the holders of the Debentures, by judicial proceedings or otherwise, to enforce the performance or observance of the covenants and agreements contained in this Indenture....
>
> FN4. Section 13.01 of the First Chase Indenture reads as follows:
> Nothing in this Indenture or any of the Debentures contained shall prevent any merger or consolidation of any other corporation or corporations into or with the Company, or any merger or consolidation of the Company (either singly or with one or more corporations), into or with any other corporation, or any sale, lease, transfer or other disposition of all or substantially all of its property to any corporation lawfully entitled to acquire the same or prevent successive similar consolidations, mergers, sales, leases, transfers or other dispositions to which the Company or its successors or assigns or any subsequent successors or assigns shall be a party; provided, however, and the Company convenants and agrees, that any such consolidation or merger of the Company or any such sale, lease, transfer or other disposition of all or substantially all of its property, shall be upon the condition that the due and punctual payment of the principal of, interest and premium, if any, on, all of the Debentures, according to their tenor, and the due and punctual performance and observance of all the terms, covenants and conditions of this Indenture to be kept or performed by the Company shall, by an indenture supplemental hereto, executed and delivered to the Trustee, be assumed by any corporation formed by or resulting from any such consolidation or merger, or to which all or substantially all of the property of the Company shall have been sold, leased, transferred or otherwise disposed of (such corporation being herein called the "successor corporation"), just as fully and effectively as if the successor corporation had been the original party of the first part hereto, and such supplemental indenture shall be construed as and shall constitute a novation thereby releasing the Company (unless its identity be merged into or consolidated with that of the successor corporation) from all liability upon, under or with respect to any of the covenants or agreements of this Indenture but not, however, from its liability upon the Debentures.
> After the execution and delivery of the supplemental indenture referred to in the preceding paragraph, any order, certificate, resolution or other instrument of the Board of Directors or officers of the Company may be made by the like board or officers of the successor corporation. The Trustee shall receive an Officers' Certificate that the foregoing conditions are complied with, and an Opinion of Counsel that any such indenture supplemental hereto complies with the foregoing conditions and provisions of this Section 13.01. Subject to the provisions of Section 10.01, such Officers' Certificate and Opinion shall be full warrant to the Trustee for any action taken in reliance thereon.
>
> FN5. Paragraph 8 of the Port Huron Lease Guaranty reads:
> The Guarantor will maintain its corporate existence, will not dissolve or otherwise dispose of all or substantially all of its assets and will not consolidate with or merge into another corporation or permit one or more

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

other corporations to consolidate with or merge into it; provided that the Guarantor may consolidate with or merge into another corporation, or permit one or more other such corporations to consolidate with or merge into it, or sell or otherwise transfer to another such corporation all or substantially all of its assets as an entirety and thereafter dissolve, provided the surviving, resulting or transferee corporation, as the case may be, if it is not the Guarantor, shall expressly assume in writing all of the obligations of the Guarantor hereunder; provided, however, that neither the Company nor the Guarantor may dispose of all or substantially all of its assets to the other and may not consolidate with or merge into the other unless the Company and the Guarantor deliver to the Trustee and the City an opinion of counsel, satisfactory to the Trustee and the City, that the disposition, consolidation or merger, as the case may be, will not result in the merger of the Lease and Lease Guaranty Agreement or any provisions thereof, but that the Lease and Lease Guaranty Agreement and the provisions thereof will remain separate obligations of the transferee [sic] or consolidated or merged corporation which can be proved and scheduled separately in bankruptcy proceedings (as if the transfer, consolidation or merger had not taken place). The Guarantor will cause the Company to preserve and keep in full force and effect all licenses and permits necessary to the proper conduct of its business.

FN6. Paragraph 8 of the Union Planters Lease Guaranty reads:
The Guarantor will maintain its corporate existence, will not dissolve or otherwise dispose of all or substantially all of its assets and will not consolidate with or merge into another corporation or permit one or more other corporations to consolidate with or merge into it; provided that the Guarantor may consolidate with or merge into another corporation, or permit one or more other such corporations to consolidate with or merge into it, or sell or otherwise transfer to another such corporation all or substantially all of its assets as an entirety and thereafter dissolve, provided the surviving, resulting or transferee corporation, as the case may be, if it is not the Guarantor, shall expressly assume in writing all of the obligations of the Guarantor hereunder; provided, however, that neither the Company nor the Guarantor may dispose of all or substantially all of its assets to the other and may not consolidate with or merge into the other unless the Company and the Guarantor deliver to the Trustee and the County an opinion of counsel, satisfactory to the Trustee and the County, that the disposition, consolidation or merger, as the case may be, will not result in the merger of the Lease and Lease Guaranty Agreement or any provisions thereof, but that the Lease and Lease Guaranty Agreement and the provisions thereof will remain separate obligations of the transferee or consolidated or merged corporation which can be proved and scheduled separately in bankruptcy proceedings (as if the transfer, consolidation or merger had not taken place). The Guarantor will cause the Company to preserve and keep in full force and effect all licenses and permits necessary to the proper conduct of its business.

FN7. Section 11.01 of the Manufacturers Indenture reads as follows:
*Company May Consolidate, etc., on Certain Terms.* Subject to the provisions of Section 11.02, nothing contained in this Indenture or in any of the Debentures shall prevent any consolidation or merger of the Company with or into any other corporation or corporations (whether or not affiliated with the Company), or successive consolidations or mergers in which the Company or its successor or successors shall be a party or parties, or shall prevent any sale, conveyance or lease of all or substantially all of the property of the Company to any other corporation (whether or not affiliated with the Company) authorized to acquire and operate the same; *provided, however,* and the Company hereby covenants and agrees, that any such consolidation, merger, sale, conveyance or lease shall be upon the condition that (a) immediately after such consolidation, merger, sale, conveyance or lease the corporation (whether the Company or such other corporation) formed by or surviving any such consolidation or merger, or to which such sale, conveyance or lease shall have been made, shall not be in default in the performance or observance of any of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

691 F.2d 1039
691 F.2d 1039
(Cite as: 691 F.2d 1039)

Page 6

the terms, covenants and conditions of this Indenture to be kept or performed by the Company; (b) the corporation (if other than the Company) formed by or surviving any such consolidation or merger, or to which such sale, conveyance or lease shall have been made, shall be a corporation organized under the laws of the United States of America or any State thereof; and (c) the due and punctual payment of the principal of and premium, if any, and interest on all of the Debentures, according to their tenor, and the due and punctual performance and observance of all the covenants and conditions of this Indenture to be performed or observed by the Company, shall be expressly assumed, by supplemental indenture satisfactory in form to the Trustee executed and delivered to the Trustee, by the corporation (if other than the Company) formed by such consolidation, or into which the Company shall have been merged, or by the corporation which shall have acquired or leased such property.

FN8. Section 11.01 of the U. S. Trust Indenture reads as follows:
*Company May Consolidate, etc., on Certain Terms.* Nothing contained in this Indenture or in any of the Notes shall prevent any consolidation or merger of the Company with or into any other corporation or corporations (whether or not affiliated with the Company), or successive consolidations or mergers in which the Company or its successor or successors shall be a party or parties, or shall prevent any sale, conveyance or lease of all or substantially all of the property of the Company to any other corporation (whether or not affiliated with the Company) authorized to acquire and operate the same; *provided, however,* and the Company hereby covenants and agrees, that any such consolidation, merger, sale, conveyance or lease shall be upon the condition that (a) immediately after such consolidation, merger, sale, conveyance or lease the corporation (whether the Company or such other corporation) formed by or surviving any such consolidation or merger, or to which such sale, conveyance or lease shall have been made, shall not be in default in the performance or observance of any of the terms, covenants and conditions of this Indenture to be kept or performed by the Company; (b) the corporation (if other than the Company) formed by or surviving any such consolidation or merger, or to which such sale, conveyance or lease shall have been made, shall be a corporation organized under the laws of the United States of America or any State thereof; and (c) the due and punctual payment of the principal of and interest on all of the Notes, according to their tenor, and the due and punctual performance and observance of all of the covenants and conditions of this Indenture to be performed or observed by the Company, shall be expressly assumed, by supplemental indenture satisfactory in form to the Trustee executed and delivered to the Trustee, by the corporation (if other than the Company) formed by such consolidation shall have been merged, or by the corporation which shall have been merged, or by the corporation which shall have acquired or leased such property.

2. *The Liquidation of UV*

During 1977 and 1978, UV operated three separate lines of business. One line, electrical equipment and components, was carried on by Federal Pacific Electric Company ("Federal"). In 1978, Federal generated 60% of UV's operating revenue and 81% of its operating profits. It constituted 44% of the book value of UV's assets and 53% of operating assets. UV also owned and operated oil and gas properties, producing 2% of its operating revenue and 6% of operating profits. These were 5% of book value assets and 6% of operating assets. UV also was involved in copper and brass fabrication, through Mueller Brass, and metals mining, which together produced 13% of profits, 38% of revenue and constituted 34% of book value assets and 41% of operating assets. In addition to these operating assets, UV had cash or other liquid assets amounting to 17% of book value assets.

On December 19, 1978, UV's Board of Directors announced a plan to sell Federal. On January 19, 1979, the UV Board announced its intention to liquidate UV, subject to shareholder approval. On February 20, 1979, UV distributed proxy materials, recommending approval of (i) the sale of Federal for $345,000,000 to a subsidiary of Reliance Electric Company and (ii) a Plan of Liquidation and Dissolution to sell the remaining assets of UV over a 12- month period. [FN9] The proceeds of these sales and the liquid assets were to be distributed to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

shareholders. The liquidation plan required "that at all times there be retained an amount of cash and other assets which the [UV Board of Directors] deems necessary to pay, or provide for the payment of, all of the liabilities, claims and other obligations ..." of UV. The proxy statement also provided that, if the sale of Federal and the liquidation plan were approved, UV would effect an initial liquidating distribution of $18 per share to its common stockholders.

> FN9. Completion of the Liquidation Plan within 12 months was necessary for tax reasons. If so completed, UV would avoid recognition of any taxable gain on the sale of Federal and its other assets and UV shareholders could treat liquidation distributions as capital gains rather than ordinary income.

On March 26, 1979, UV's shareholders approved the sale of Federal and the liquidation plan. The following day, UV filed its Statement of Intent to Dissolve with the Secretary of State of Maine, its state of incorporation. On March 29, the sale of Federal to the Reliance Electric subsidiary for $345 million in cash was consummated. On April 9, UV announced an $18 per share initial liquidating distribution to take place on Monday, April 30.

The Indenture Trustees were aware that UV contemplated making an $18 per share liquidating distribution since at least February 20, 1979 (the date the proxy materials were distributed). [FN10] On April 26, representatives*1046 of Chase, Manufacturers and U.S. Trust met with UV officers and directors and collectively demanded that UV pay off all the debentures within 30 days or, alternatively, that UV establish a trust fund of $180 million to secure the debt. There was testimony that at least one of the Indenture Trustees threatened to sue to enjoin UV from paying the $18 liquidating distribution on the grounds that a liquidating distribution prior to payment of UV's debts would violate Maine law, [FN11] which provides, as to a liquidating corporation, that:

> FN10. During this period, Chase, Union Planters and U. S. Trust each wrote to UV concerning its plans with respect to its long-term debt. In response to a letter from a Chase officer dated March 26, UV replied on April 9 that the debentures "will be provided for in the liquidation according to the respective Indentures and the covenants therein." Immediately following UV's announcement on April 9 that the $18 distribution would be made on April 30, U. S. Trust and Union Planters each wrote to ask UV about the payment of the debt instruments. By letter of April 20, UV replied to Union Planters stating simply that "UV will contact the trustees at a future time, when it is prepared to advise the trustees as to the mechanics of honoring its commitments." An identical letter was sent to Chase; U. S. Trust never received a reply to its inquiry.

> FN11. The Indenture Trustees apparently concede that as of the April 26 meeting none of the Indentures was in default and the forthcoming $18 distribution would not be a default under any of the indentures. Such an interpretation by the Trustees is evidenced by two letters written by Manufacturers and U. S. Trust, respectively, to debentureholders. The letter from Manufacturers to one of its debentureholders, dated June 22, 1979, states, in pertinent part:
> In our opinion and in the opinion of our counsel, neither the approval by stockholders [of UV] of the Plan of Liquidation and Dissolution, nor the initial liquidating dividend constitutes a default under the Indenture. Nor are we aware of any other act or omission on the part of UV which constitutes a default under the Indenture. Absent a default under the Indenture, neither the Trustee nor the Debentureholders can, in our opinion, require UV to call the Debentures or in any other way compel payment of the Debentures other than in accordance with the terms of the Debentures and of the Indenture.
> A similar conclusion was expressed by U. S. Trust in a letter to a debentureholder dated June 13, 1979, which reads in part:
> We advise, as Trustee, less complete Liquidation and Dissolution, that nothing has come to our attention that caused us to believe that [UV] was not in compliance with any of the covenants or agreements of the governing Indenture.

*After* paying or adequately providing for the payment of all its obligations, the corporation shall distribute the remainder of its assets ... among its

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

691 F.2d 1039
691 F.2d 1039
(Cite as: 691 F.2d 1039)

Page 8

shareholders ...
Me.Rev.Stat.Ann.Tit. 13-A, § 1106(4) (1971) (emphasis added).

The outcome of this meeting was an "Agreement for Treatment of Certain Obligations of UV Industries, Inc.," dated April 27, 1979, between UV and the Indenture Trustees ("April Document"). Under the April Document, UV agreed, *inter alia*, to set aside a cash fund of $155 million to secure its public debt and to present a proposal for the satisfaction and discharge of that debt to the Indenture Trustees within 90 days. The Indenture Trustees agreed not to seek an injunction against the payment of the $18 per share liquidating distribution. The April Document provided that all obligations thereunder would terminate upon the payment of UV's public debt or upon UV's abandonment of the plan of liquidation.

On July 23, 1979, UV announced that it had entered into an agreement for the sale of most of its oil and gas properties to Tenneco Oil Company for $135 million cash. The deal was consummated as of October 2, 1979 and resulted in a net gain of $105 million to UV.

3. *The Sale to Sharon Steel*

In November, 1979, Sharon proposed to buy UV's remaining assets. Another company, Reliance Group (unrelated to Reliance Electric), had made a similar offer. After a brief bidding contest, UV and Sharon entered into an "Agreement for Purchase of Assets" and an "Instrument of Assumption of Liabilities" on November 26, 1979. Under the purchase agreement, Sharon purchased all of the assets owned by UV on November 26 (*i.e.*, Mueller Brass, UV's mining properties and $322 million in cash or the equivalent) for $518 million ($411 million of Sharon subordinated debentures due in 2000--then valued at 86% or $353,460,000--plus $107 million in cash). Under the assumption agreement, Sharon assumed all of UV's liabilities, including the public debt issued under the indentures. UV thereupon announced that it had no further obligations under the indentures or lease guaranties, based upon the successor obligor clauses.

On December 6, 1979, in an attempt to formalize its position as successor obligor, Sharon delivered to the Indenture Trustees supplemental indentures executed by UV and Sharon. The Indenture Trustees refused to sign. Similarly, Sharon delivered an *1047 assumption of the lease guaranties to both Chase and Union Planters but those Indenture Trustees also refused to sign.

4. *The Proceedings in the District Court*

By letters dated December 24, 1979, Chase, U.S. Trust and Manufacturers issued virtually identical notices of default as a result of UV's purported assignment of its obligations to Sharon. Each demanded that the default be cured within 90 days or that the debentures be redeemed. Chase and U.S. Trust brought separate actions in New York County Supreme Court against UV and Sharon for redemption of the debentures; Manufacturers subsequently initiated a similar lawsuit. On December 26, 1979, Sharon initiated this action against Chase, U.S. Trust and Manufacturers. The state court actions have been stayed pending disposition of this case.

The amended complaint, in effect, raises five claims: (i) the April Document is of no force because it was procured by coercion and lacks consideration; (ii) the April Document expired upon Sharon's purchase of all UV's assets and assumption of UV's liabilities since it does not apply to a successor corporation; (iii) Manufacturers and Chase conspired to force UV and Sharon to redeem the debentures in violation of Section 1 of the Sherman Act; (iv) Manufacturers, Chase and U. S. Trust improperly refused to execute supplemental indentures, issued default notices and demanded immediate redemption of the debentures; and (v) Chase and Union Planters improperly refused to execute supplemental lease guaranties and demanded repayment of the debt. Chase, U. S. Trust and Manufacturers sought specific performance of the redemption provisions by counterclaim.

In February, 1980, Sharon announced that it intended to withdraw the entire $155 million fund established under the April Document. [FN12] Chase, Manufacturers and U. S. Trust sought a preliminary injunction preventing any withdrawal and requiring Sharon to hold that fund in trust for the Debentureholders. Sharon cross-moved to withdraw what it termed "excess security," that portion of the fund in excess of the aggregate amount of UV's public debt. By order dated March 5, 1980, the District Court denied the motion and cross-motion apparently because the $155 million fund was on deposit with the Indenture Trustees. During the pendency of these motions, the Debentureholders sought leave to intervene to assert claims against UV and Sharon. The Court granted intervention and subsequently certified them as the representatives of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

691 F.2d 1039
691 F.2d 1039
(Cite as: 691 F.2d 1039)

Page 9

all holders of such debentures pursuant to Fed.R.Civ.P. 23(b)(2).

> FN12. The $155 million fund created pursuant to the April Document is included in the $322 million of cash or equivalents transferred by UV to Sharon pursuant to the Purchase Agreement.

During February and March, 1980, the Indenture Trustees and the Debentureholders moved for dismissal of Sharon's amended complaint and for summary judgment. In an opinion dated September 3, 1980, reported at 88 F.R.D. 38 (S.D.N.Y.1980), the District Court denied these motions.

A jury trial was held during April and early May, 1981, at which Sharon submitted voluminous testimony and other evidence. The Indenture Trustees and Debentureholders moved for a directed verdict, and on May 11, 1981, the District Court granted the motion and dismissed Sharon's claims. The Indenture Trustees and Debentureholders subsequently moved for summary judgment on their claims and counterclaims, which was granted on June 2, 1981. A judgment encapsulating these determinations was filed on August 18, 1981.

The judgment orders: (i) dismissal with prejudice of Sharon's amended complaint; (ii) judgment in favor of the Indenture Trustees and Debentureholders on their claim that the debentures were due and payable; (iii) payment to the Debentureholders of an allocable share of the interest earned on the $155 million fund created pursuant to the April Document; (iv) an award of costs and expenses to the Indenture Trustees (including attorneys' fees); (v) an award of attorneys' fees and expenses to the Debentureholders to be paid out of the recovery; (vi) dismissal of the claims of the Indenture Trustees and the Debentureholders for a redemption premium; and (vii) impression of a constructive trust for the Debentureholders on the $155 *1048 million fund sufficient to satisfy the debt (plus $2 million as an estimate of costs) and remission of funds in excess of that amount to Sharon.

Sharon and the UV Defendants appeal various portions of judgment. The Indenture Trustees and Debentureholders cross-appeal from the denial of the redemption premium. The Debentureholders cross-appeal from the denial of legal fees and expenses to be paid by UV and Sharon, rather than from the class recovery.

DISCUSSION
1. *The Successor Obligor Clauses*

Sharon Steel argues that Judge Werker erred in not submitting to the jury issues going to the meaning of the successor obligor clauses. We disagree.

[1] Successor obligor clauses are "boilerplate" or contractual provisions which are standard in a certain genre of contracts. Successor obligor clauses are thus found in virtually all indentures. Such boilerplate must be distinguished from contractual provisions which are peculiar to a particular indenture and must be given a consistent, uniform interpretation. As the American Bar Foundation *Commentaries on Indentures* (1971) ("*Commentaries*") state:

> Since there is seldom any difference in the intended meaning [boilerplate] provisions are susceptible of standardized expression. The use of standardized language can result in a better and quicker understanding of those provisions and a substantial saving of time not only for the draftsman but also for the parties and all others who must comply with or refer to the indenture, including governmental bodies whose approval or authorization of the issuance of the securities is required by law.

*Id.*

[2] Boilerplate provisions are thus not the consequence of the relationship of particular borrowers and lenders and do not depend upon particularized intentions of the parties to an indenture. There are no adjudicative facts relating to the parties to the litigation for a jury to find and the meaning of boilerplate provisions is, therefore, a matter of law rather than fact.

Moreover, uniformity in interpretation is important to the efficiency of capital markets. As the Fifth Circuit has stated:

> A large degree of uniformity in the language of debenture indentures is essential to the effective functioning of the financial markets: uniformity of the indentures that govern competing debenture issues is what makes it possible meaningfully to compare one debenture issue with another, focusing only on the business provisions of the issue (such as the interest rate, the maturity date, the redemption and sinking fund provisions in the conversion rate) and the economic conditions of the issuer, without being misled by peculiarities in the underlying instruments.

*Broad v. Rockwell International Corp.,* 642 F.2d

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

691 F.2d 1039                                                                                                                Page 10
691 F.2d 1039
(Cite as: 691 F.2d 1039)

929, 943 (5th Cir.), cert. denied, 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981). Whereas participants in the capital market can adjust their affairs according to a uniform interpretation, whether it be correct or not as an initial proposition, the creation of enduring uncertainties as to the meaning of boilerplate provisions would decrease the value of all debenture issues and greatly impair the efficient working of capital markets. Such uncertainties would vastly increase the risks and, therefore, the costs of borrowing with no offsetting benefits either in the capital market or in the administration of justice. Just such uncertainties would be created if interpretation of boilerplate provisions were submitted to juries sitting in every judicial district in the nation.

[3] Sharon also argues that Judge Werker erred in rejecting evidence of custom and usage and practical construction as to the meaning of the successor obligor clauses. While custom or usage might in some circumstances create a fact question as to the interpretation of boilerplate provisions, the evidence actually offered by Sharon simply did not tend to prove a relevant custom or usage. Sharon's experts both conceded that so far as the meaning of successor obligor clauses and the language "all or substantially all" are concerned, the UV/Sharon transaction was unique. Their *1049 testimony was thus limited to use of such clauses and such language in very different contexts. Because context is of obvious and critical importance to the use of particular language, the testimony offered did not tend to prove or disprove a material fact.

Sharon's proffer of evidence as to practical construction also fails. At best, it amounted to a few statements over a two-week period by Indenture Trustees or Debentureholders implying that a purchaser such as Sharon might become a successor obligor. Sharon's offer of proof falls woefully short of the kind of mutual understanding over a period of time which is necessary for practical construction to become relevant to interpretation. Compare Gordon v. Vincent Youmans, Inc., 358 F.2d 261, 264 (2d Cir. 1965); Portsmouth Baseball Corp. v. Frick, 278 F.2d 395, 400-02 (2d Cir.), cert. denied 364 U.S. 831, 81 S.Ct. 71, 5 L.Ed.2d 58 (1960). Particularly where boilerplate is concerned, a more deliberate and enduring course of conduct is necessary to utilize practical construction.

We turn now to the meaning of the successor obligor clauses. Interpretation of indenture provisions is a matter of basic contract law. As the Commentaries at 2 state:

 The second fundamental characteristic of long term debt financing is that the rights of holders of the debt securities are largely a matter of contract. There is no governing body of statutory or common law that protects the holder of unsecured debt securities against harmful acts by the debtor except in the most extreme situations ... [T]he debt securityholder can do nothing to protect himself against actions of the borrower which jeopardize its ability to pay the debt unless he ... establishes his rights through contractual provisions set forth in the ... indenture.

Contract language is thus the starting point in the search for meaning and Sharon argues strenuously that the language of the successor obligor clauses clearly permits its assumption of UV's public debt. Sharon's argument is a masterpiece of simplicity: on November 26, 1979, it bought everything UV owned; therefore, the transaction was a "sale" of "all" UV's "assets." In Sharon's view, the contention of the Indenture Trustees and Debentureholders that proceeds from earlier sales in a predetermined plan of piecemeal liquidation may not be counted in determining whether a later sale involves "all assets" must be rejected because it imports a meaning not evident in the language.

Sharon's literalist approach simply proves too much. If proceeds from earlier piecemeal sales are "assets," then UV continued to own "all" its "assets" even after the Sharon transaction since the proceeds of that transaction, including the $107 million cash for cash "sale," went into the UV treasury. If the language is to be given the "literal" meaning attributed to it by Sharon, therefore, UV's "assets" were not "sold" on November 26 and the ensuing liquidation requires the redemption of the debentures by UV. Sharon's literal approach is thus self-defeating.

The words "all or substantially all" are used in a variety of statutory and contractual provisions relating to transfers of assets and have been given meaning in light of the particular context and evident purpose. See Campbell v. Vose, 515 F.2d 256 (10th Cir. 1975) (transfer of sole operating asset held to be a sale of all or substantially all of the corporation's assets even though two-thirds of asset book value in the form of bank balances, promissory notes and an investment portfolio was retained); Atlas Tool Company v. Commissioner, 614 F.2d 860 at 865-66 (3rd Cir. 1980). ("Substantially all" requirement is chiefly determined by the transfer of operating assets). Sharon argues that such decisions are distinguishable because they serve the purpose of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

691 F.2d 1039
691 F.2d 1039
(Cite as: 691 F.2d 1039)

Page 11

either shareholder protection or enforcement of the substance of the Internal Revenue Code. Even if such distinctions are valid, these cases nevertheless demonstrate that a literal reading of the words "all or substantially all" is not helpful apart from reference to the underlying purpose to be served. We turn, therefore, to that purpose.

*1050 Sharon argues that the sole purpose of successor obligor clauses is to leave the borrower free to merge, liquidate or to sell its assets in order to enter a wholly new business free of public debt and that they are not intended to offer any protection to lenders. On their face, however, they seem designed to protect lenders as well by assuring a degree of continuity of assets. Thus, a borrower which sells all its assets does not have an option to continue holding the debt. It must either assign the debt or pay it off. As the *Commentaries* state at 290:

> The decision to invest in the debt obligations of a corporation is based on the repayment potential of a business enterprise possessing specific financial characteristics. The ability of the enterprise to produce earnings often depends on particular assets which it owns. Obviously, if the enterprise is changed through consolidation with or merged into another corporation or through disposition of assets, the financial characteristics and repayment potential on which the lender relied may be altered adversely.

The single reported decision construing a successor obligor clause, B. S. F. Company v. Philadelphia National Bank, 42 Del.Ch. 106, 204 A.2d 746 (1964), clearly held that one purpose of the clause was to insure that the principal operating assets of a borrower are available for satisfaction of the debt.

Sharon seeks to rebut such inferences by arguing that a number of transactions which seriously dilute the assets of a company are perfectly permissible under such clauses. For example, UV might merge with, or sell its assets to, a company which has a miniscule equity base and is debt heavy. They argue from these examples that the successor obligor clause was not intended to protect borrowers from the kind of transaction in which UV and Sharon engaged.

We disagree. In fact, a substantial degree of protection against diluting transactions exists for the lender. Lenders can rely, for example, on the self-interest of equityholders for protection against mergers which result in a firm with a substantially greater danger of insolvency. So far as the sale of assets to such a firm is concerned, that can occur but substantial protection exists even there since the more debt heavy the purchaser, the less likely it is that the seller's equityholders would accept anything but cash for the assets. A sale to a truly crippled firm is thus unlikely given the self-interest of the equityholders. After a sale, moreover, the lenders would continue to have the protection of the original assets. In both mergers and sales, complete protection against an increase in the borrower's risk is not available in the absence of more specific restrictions, but the self-interest of equityholders imposes a real and substantial limit to that increase in risk. The failure of successor obligor clauses to provide even more protection hardly permits an inference that they are designed solely for the benefit of borrowers.

Sharon poses hypotheticals closer to home in the hope of demonstrating that successor obligor clauses protect only borrowers: *e.g.*, a transaction involving a sale of Federal and the oil and gas properties in the regular course of UV's business followed by an $18 per share distribution to shareholders after which the assets are sold to Sharon and Sharon assumes the indenture obligations. To the extent that a decision to sell off some properties is not part of an overall scheme to liquidate and is made in the regular course of business it is considerably different from a plan of piecemeal liquidation, whether or not followed by independent and subsequent decisions to sell off the rest. A sale in the absence of a plan to liquidate is undertaken because the directors expect the sale to strengthen the corporation as a going concern. A plan of liquidation, however, may be undertaken solely because of the financial needs and opportunities or the tax status of the major shareholders. In the latter case, relatively quick sales may be at low prices or may break up profitable asset combinations, thus drastically increasing the lender's risks if the last sale assigns the public debt. In this case, for example, tax considerations compelled completion of the liquidation within 12 months. The fact that piecemeal sales in *1051 the regular course of business are permitted thus does not demonstrate that successor obligor clauses apply to piecemeal liquidations, allowing the buyer last in time to assume the entire public debt.

[4] We hold, therefore, that protection for borrowers as well as for lenders may be fairly inferred from the nature of successor obligor clauses. The former are enabled to sell entire businesses and liquidate, to consolidate or merge with another corporation, or to liquidate their operating assets and enter a new field free of the public debt. Lenders, on the other hand, are assured a degree of continuity of assets.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

691 F.2d 1039  
691 F.2d 1039  
(Cite as: 691 F.2d 1039)

Page 12

[5] Where contractual language seems designed to protect the interests of both parties and where conflicting interpretations are argued, the contract should be construed to sacrifice the principal interests of each party as little as possible. An interpretation which sacrifices a major interest of one of the parties while furthering only a marginal interest of the other should be rejected in favor of an interpretation which sacrifices marginal interests of both parties in order to protect their major concerns.

[6] Of the contending positions, we believe that of the Indenture Trustees and Debentureholders best accommodates the principal interests of corporate borrowers and their lenders. Even if the UV/Sharon transaction is held not to be covered by the successor obligor clauses, borrowers are free to merge, consolidate or dispose of the operating assets of the business. Accepting Sharon's position, however, would severely impair the interests of lenders. Sharon's view would allow a borrowing corporation to engage in a piecemeal sale of assets, with concurrent liquidating dividends to that point at which the asset restrictions of an indenture prohibited further distribution. A sale of "all or substantially all" of the remaining assets could then be consummated, a new debtor substituted, and the liquidation of the borrower completed. The assignment of the public debt might thus be accomplished, even though the last sale might be nothing more than a cash for cash transaction in which the buyer purchases the public indebtedness. The UV/Sharon transaction is not so extreme, but the sale price paid by Sharon did include a cash for cash exchange of $107 million. Twenty-three percent of the sale price was, in fact, an exchange of dollars for dollars. Such a transaction diminishes the protection for lenders in order to facilitate deals with little functional significance other than substituting a new debtor in order to profit on a debenture's low interest rate. We hold, therefore, that boilerplate successor obligor clauses do not permit assignment of the public debt to another party in the course of a liquidation unless "all or substantially all" of the assets of the company at the time the plan of liquidation is determined upon are transferred to a single purchaser.

The application of this rule to the present case is not difficult. The plan of liquidation was approved by UV's shareholders on March 26, 1978. Since the Indenture Trustees make no claim as to an earlier time, e.g., the date of the Board recommendation, we accept March 26 as the appropriate reference date. The question then is whether "all or substantially all" of the assets held by UV on that date were transferred to Sharon. That is easily answered. The assets owned by UV on March 26 and later transferred to Sharon were Mueller Brass, certain metals mining property, and substantial amounts of cash and other liquid assets. UV's Form 10-K and Sharon's Form S-7 state that Mueller Brass and the metals mining properties were responsible for only 38% of UV's 1978 operating revenues and 13% of its operating profits. They constitute 41% of the book value of UV's operating properties. When the cash and other liquid assets are added, the transaction still involved only 51% of the book value of UV's total assets.

Since we do not regard the question in this case as even close, we need not determine how the substantiality of corporate assets is to be measured, what percentage meets the "all or substantially all" test or what role a jury might play in determining those issues. Even when the liquid assets (other than proceeds from the sale of Federal *1052 and the oil and gas properties) are aggregated with the operating properties, the transfer to Sharon accounted for only 51% of the total book value of UV's assets. In no sense, therefore, are they "all or substantially all" of those assets. The successor obligor clauses are, therefore, not applicable. UV is thus in default on the indentures and the debentures are due and payable. For that reason, we need not reach the question whether the April Document was breached by UV.

2. *The Anti-Trust Claim*

[7] Sharon's anti-trust claims border on the frivolous. While there can be little question that the Indenture Trustees engaged in concerted activity, Sharon has not shown any anti-competitive purpose or effect injurious to consumer welfare. *Broadcast Music, Inc. v. CBS, Inc.*, 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979). The Indenture Trustees were faced with a common breach of the indenture agreements by UV and their seeking to arrive at, and arriving at, a common position as to that breach is not anti-competitive.

Joint activity by creditors facing a debtor is commonly in the interests of all parties. *Falstaff Brewing Corp. v. New York Life Insurance Company*, 513 F.Supp. 289 (N.D.Cal.1978). If creditors were forced to act individually, each would be compelled to resort to the most extreme action available in order to protect its individual interest. Such an action, however, might well drive the debtor out of business thereby eliminating any opportunity for it to work out

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

691 F.2d 1039
691 F.2d 1039
(Cite as: 691 F.2d 1039)

Page 13

of present difficulties and ultimately satisfy the debts. Mutual forebearance by creditors, therefore, may be in the interests of both debtors and creditors in that it maximizes repayment and gives the debtor a chance of survival. That it entails concerted activity by the creditors does not mean, however, that consumers are injured. To the contrary, by reducing both losses to creditors and the transaction costs resulting from bankruptcy, such activity reduces the costs of borrowing and the costs of doing business, all of which is to the consumer's advantage.

While the present case does not involve an insolvent corporation, the same considerations apply. Indenture Trustees do not have power to compromise with the borrower or to vary the terms of the indenture. Kennedy and Landau, *Corporate Trust* 227 (2d ed. 1975). They are, moreover, bound to enforce the indentures. At the time that the concerted activity in this case began, UV's Board had approved a liquidating plan which was wholly imprecise as to when or how UV's public debt was to be satisfied. The Indenture Trustees had, as one option, a perfectly plausible action under Maine's Section 1106 to enjoin the April 30 liquidating distribution. As a practical matter, had the Trustees not conferred and acted in concert, each would have been under pressure to follow the lead of that trustee which sought the most extreme remedy. For a Trustee to do otherwise would risk litigation against it by Debentureholders claiming that it had failed to pursue appropriate legal actions. For all of UV's current enthusiasm about dealing with the Trustees individually, it was in its interest at the time to deal with them jointly. Had any Trustee concluded that its Debentureholders were faring less well in the negotiations than others, it would surely have resorted to an action under Section 1106. Independent negotiations would thus have inevitably led to an action by at least one trustee to enjoin the initial liquidating distribution. Once one suit had begun, others would have followed unless UV paid off the debentures. The April Document avoided this result by creating a fund intended to comply with Section 1106. Such an agreement could not have been reached other than through collective negotiations with the Indenture Trustees. Indeed, that a joint agreement was preferable to litigation so far as UV is concerned is underlined by Sharon's present (and unpersuasive) contention that the April Document is invalid because UV was coerced by the threat of just such litigation.

We conclude, therefore, no anti-competitive purpose or effect in such concerted activity by the indenture trustees. By allowing the parties to various indentures to *1053 seek compromise arrangements avoiding resort to litigation while protecting all concerned, such collective activity reduces the costs of indenture enforcement and the costs of borrowing. *Broadcast Music, Inc.*, 441 U.S. at 21-22, 99 S.Ct. at 1563. UV was in no way foreclosed from the capital market or otherwise deprived of the benefits of free competition.

3. *The Redemption Premium*

[8] Judge Werker held that the redemption premium under the indentures need not be paid by UV. His reasoning was essentially that UV defaulted under the indenture agreement and that the default provisions provide for acceleration rather than a redemption premium. We do not agree. The acceleration provisions of the indentures are explicitly permissive and not exclusive of other remedies. We see no bar, therefore, to the Indenture Trustees seeking specific performance of the redemption provisions where the debtor causes the debentures to become due and payable by its voluntary actions.

This is not a case in which a debtor finds itself unable to make required payments. The default here stemmed from the plan of voluntary liquidation approved on March 26, 1979, followed by the unsuccessful attempt to invoke the successor obligor clauses. The purpose of a redemption premium is to put a price upon the voluntary satisfaction of a debt before the date of maturity. While such premiums may seem largely irrelevant for commercial purposes in times of high interest rates, they nevertheless are part of the contract and would apply in a voluntary liquidation which included plans for payment and satisfaction of the public debt. We believe it undermines the plain purpose of the redemption provisions to allow a liquidating debtor to avoid their terms simply by failing to take the steps necessary to redeem the debentures, thereby creating a default. We hold, therefore, that the redemption premium must be paid. See *Harnickell v. Omaha Water Co.*, 146 A.D. 693, 131 N.Y.S. 489 (1st Dep't 1911), *aff'd*, 208 N.Y. 520, 101 N.E. 1104 (1913).

4. *Restitution*

[9] Judge Werker also held that all UV's Debentureholders were entitled to the interest earned on the fund established under the April Document from the date on which he found that agreement breached. This recovery is not based on any contract with UV. The indentures do not provide for the

691 F.2d 1039  
691 F.2d 1039  
(Cite as: 691 F.2d 1039)

Page 14

payment of such additional interest in the event of default. Nor is there anything in the April Document entitling the Debentureholders to interest earned on this fund which was set aside as security for the amounts due, including accrued interest, under the debentures.

The District Court's decision also cannot be sustained on the basis of general equitable principles. It is not unjust enrichment to earn interest on a sum which is the subject of future or pending litigation absent contractual provisions directing otherwise. Moreover, Sharon's and UV's pursuit of this litigation is not such an abuse of process as to call for an extraordinary award to its adversaries. While we are not impressed by their arguments, we certainly are not prepared to say that their claims as to the meaning of the successor obligor clause were wholly frivolous. Compare *Bankers Trust Co. v. Publicker Industries, Inc.*, 641 F.2d 1361, 1367 (2d Cir. 1981). We, therefore, reverse the award of interest earned on the fund over and above the amount of accrued interest due under the debentures.

5. *Attorney's Fees*

[10] Judge Werker granted attorney's fees and expenses to the Debentureholders to be recovered out of the common fund secured for the class they have represented. The Debentureholders argue that Sharon Steel should be made to pay those fees and expenses. Noting that the debentures specifically provide for payment of attorney's fees and expenses only for litigation brought by the Indenture Trustees, we affirm this ruling on Judge Werker's opinion.

CONCLUSION

We affirm Judge Werker's dismissal of Sharon's amended complaint and award of *1054 judgment to the Indenture Trustees and Debentureholders on their claim that the debentures are due and payable. We reverse his dismissal of the claim for payment of the redemption premium and his award of the interest earned on the $155 million fund. We affirm his granting of attorney's fees and expenses to the Debentureholders out of the judgment recovered. The Indenture Trustees shall be awarded their full costs. The Debentureholders shall be awarded one-half their costs.

691 F.2d 1039

**Briefs and Other Related Documents (Back to top)**

• 1982 WL 609000 (Appellate Brief) Reply Brief of the Indenture Trustees and Intervening Debentureholders (Apr. 02, 1982)Original Image of this Document (PDF)

• 1982 WL 608998 (Appellate Brief) Reply Brief for Appellants-Cross Appellees UV Industries, Inc. and the Trustees of the UV Industries, Inc. Liquidating Trust (Mar. 12, 1982)Original Image of this Document (PDF)

• 1982 WL 608999 (Appellate Brief) Reply Brief of Plaintiff-Appellant-Cross Appellee Sharon Steel Corporation (Mar. 12, 1982)Original Image of this Document (PDF)

• 1982 WL 608997 (Appellate Brief) Brief of the Indenture Trustees and Intervening Debentureholders (Feb. 12, 1982)Original Image of this Document with Appendix (PDF)

• 1981 WL 390790 (Appellate Brief) Brief of Plaintiff-Appellant-Cross Appellee Sharon Steel Corporation (Dec. 18, 1981)Original Image of this Document (PDF)

• 1981 WL 390791 (Appellate Brief) Brief for Appellants UV Industries, Inc. and the Trustees of the UV Industries, Inc. Liquidating Trust (Dec. 18, 1981)Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.