UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

AIG GLOBAL INVESTMENT CORP.       No. 07 Civ. 3693 (SAS)

                Plaintiff,    :

                        ECF CASE

       - against -        :

                        Document Electronically filed

TYCO INTERNATIONAL GROUP S.A.    :

               Defendant.   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Jonathan J. Lerner (JL-7117)
Joseph N. Sacca (JS-9435)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Defendant

*Of Counsel:*

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Thomas J. Nolan
Peter B. Morrison (PM-5062)
300 S. Grand Ave.
Los Angeles, CA 90071
(213) 687-5000

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS ................................................................................................... 5

    A.    The Parties ................................................................................................... 5

    B.    The Spin-Off Transaction ........................................................................... 5

    C.    The Notes Issued Pursuant to the 1998 and 2003 Indentures .................... 7

            1.    Successor Obligor Clause .............................................................. 7

            2.    The Default Provision .................................................................... 7

    D.    The Tender Offer and Consent Solicitation ................................................ 8

    E.    AIG Files Its Complaint And Motion For Preliminary Injunction ............ 9

    F.    The Supplemental Disclosure to the Tender Offer and Consent Solicitation ........ 10

ARGUMENT ...................................................................................................................... 11

THE COURT SHOULD REFUSE TO ISSUE A PRELIMINARY INJUNCTION,
WHICH IS AN EXTRAORDINARY REMEDY GRANTED SPARINGLY ..................... 11

I.    AIG HAS FAILED TO ESTABLISH IRREPARABLE INJURY ..................... 12

    A.    The Alleged Injury About Which AIG Complains Can Adequately Be
Remedied by a Monetary Award .............................................................. 12

    B.    AIG's Attempt To Dress Up Its Contract Claim in Section 14(e) Garb Is
Unavailing ................................................................................................ 14

II.    AIG HAS FAILED TO ESTABLISH ANY
LIKELIHOOD OF SUCCESS ON THE MERITS .......................................... 16

    A.    By Disclosing the Claims Made by AIG, TIGSA Has Disclosed What AIG
Contends The Solicitation Materials Omitted, And TIGSA Has Extended
The Early Consent Deadline, Thus Permitting Noteholders Time to
Absorb This Information ............................................................................ 16

    B.    AIG's Sole Reliance On *Sharon Steel Corp. v. Chase Manhattan Bank* Is
Misplaced .................................................................................................. 17

III.    AIG HAS FAILED TO ESTABLISH THAT THE BALANCE OF HARDSHIPS
        TIPS DECIDEDLY TOWARD IT ..................................................................................20

CONCLUSION..............................................................................................................................22

## TABLE OF AUTHORITIES

CASES                                                                          PAGE(S)

*American Insured Mortgage Investors v. CRI, Inc.,*
  No. 90 Civ. 630 (MBM) 1990 WL 192561 (S.D.N.Y. Nov. 26, 1990)............15

*Bacine v. Scharffenberger,*
  No. 7862, 1984 WL 21128 (Del. Ch. Dec. 11, 1984)........................19

*Bally Total Fitness Holding Corp. v. Liberation Investments, L.P.,*
  No. Civ. A. 05- 841-JJF, 2005 WL 3525679 (D. Del. Dec. 22, 2005)............17

*City Capital Associates L.P. v. Interco, Inc.,*
  696 F. Supp. 1551 (D. Del.), *aff'd,* 860 F.2d 60 (3d Cir. 1988)........................17

*Consolidated Gold Fields LC v. Minorco, S.A.,*
  871 F.2d 252 ( 2d Cir. 1989)........................................15

*Deal, LLC v. Korangy Publishing, Inc.,*
  309 F. Supp. 2d 512 (S.D.N.Y. 2004)........................................11

*E.H.I. of Florida, Inc. v. Insurance Co. of North America,*
  499 F. Supp. 1053 (E.D. Pa. 1980), *aff'd,* 652 F.2d 310 (3d Cir. 1981)............13

*E.ON AG v. Acciona S.A.,*
  468 F. Supp. 2d 537 (S.D.N.Y. 2006)........................................15

*Freer v. Mayer,*
  No. 91 Civ. 2519, 1991 WL 355062 (S.D.N.Y. Apr. 26, 1991)........................16

*Grand River Enterprise Six Nations Ltd. v. Pryor,*
  481 F.3d 60 (2d Cir. 2007)........................................11

*Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Co.,*
  476 F.2d 687 (2d Cir. 1973)........................................15

*Iavarone v. Raymond Keyes Associates,*
  733 F. Supp. 727 (S.D.N.Y. 1990) ........................................14

*Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,*
  596 F.2d 70 (2d Cir. 1979)........................................12

*John Labatt Ltd. v. Onex Corp.,*
  890 F. Supp. 235 (S.D.N.Y. 1995) ........................................14

*Luce v. Edelstein,*
  802 F.2d 49 (2d Cir. 1986)........................................12

*Maltz v. Aetna Health Plans of New York, Inc.,*
    114 F.3d 9 (2d Cir. 1997)...................................................................................12

*Management Assistance Inc. v. Edelman,*
    584 F. Supp. 1021 (S.D.N.Y. 1984)...................................................................17

*Morgan Stanley & Co. v. Archer Daniels Midland Co.,*
    570 F. Supp. 1529 (S.D.N.Y. 1983)...............................................................2, 13

*Oberly v. Kirby,*
    592 A.2d 445 (Del. 1991) ..................................................................................19

*Olesh v. Dreyfus Corp.,*
    No. CV-94-2909, 1994 WL 780179 (E.D.N.Y. Aug. 15, 1994)...................14, 15

*Plant Industries, Inc. v. Bregman,*
    490 F. Supp. 265 (S.D.N.Y. 1980) ....................................................................15

*Ranger Oil Ltd. v. Petrobank Energy & Resources Ltd.,*
    No. 00CIV3139SHS, 2000 WL 33115906 (S.D.N.Y. May 23, 2000) ...................3, 16, 17

*Revlon, Inc. v. Pantry Pride, Inc.,*
    621 F. Supp. 804 (D. Del. 1985).........................................................................17

*Ryan v. VHA Enterprises, Inc.,*
    No. 90 Civ. 2656 (PKL), 1990 WL 58969 (S.D.N.Y. May 1, 1990)...................15

*Schmidt v. Enertec Corp.,*
    598 F. Supp. 1528 (S.D.N.Y. 1984)..............................................................14, 15

*Sharon Steel Corp. v. Chase Manhattan Bank, N.A.,*
    691 F.2d 1039 (2d Cir. 1982).......................................2, 4, 10, 14, 18, 19, 20, 21

*Sonesta International Hotels Corp. v. Wellington Associates,*
    483 F.2d 247 (2d Cir. 1973)...............................................................................15

*Sperry International Trade, Inc. v. Government of Israel,*
    670 F.2d 8 (2d Cir. 1982)..............................................................................12, 17

*Telenor East Invest AS v. Eco Telecom Ltd.,*
    No. 05 Civ 7584, 2005 WL 2239999 (S.D.N.Y. Sept. 7, 2005).......................17

*Telex Corp. v. Edelman,*
    No. 87-C-873-E, 1987 WL 43390 (N.D. Okla. Nov. 5, 1987) ...........................17

*Wildmon v. Berwick Universal Pictures,*
    983 F.2d 21 (5th Cir. 1992) ..........................................................................12, 13

STATUTES

15 U.S.C. § 78n(e) ............................................................................................................ *passim*

Defendant Tyco International Group S.A. ("TIGSA") respectfully submits this memorandum of law in opposition to the motion for a preliminary injunction filed by Plaintiff AIG Global Investment Corp. ("AIG").

## PRELIMINARY STATEMENT

AIG's motion for a preliminary injunction seeks to enjoin TIGSA's current tender offer for certain of its outstanding public debt (the "Notes"). The motion should be denied because AIG fails to come close to establishing any of the basic requirements for the extraordinary relief it seeks – irreparable injury, a likelihood of success on the merits, or a balancing of the hardships tipping strongly in its favor. At most, AIG's complaint, which is completely devoid of *any* allegations of irreparable injury, asserts a contract dispute for which a complete and specific contractual remedy is prescribed in the form of money damages.

This action arises out of the proposed spin-off of Tyco International Ltd. ("Tyco"), TIGSA's publicly-traded parent, that is expected to close in late June. Tyco plans to spin-off two of its four current business segments (Tyco Electronics and Tyco Healthcare) to its current shareholders as separate, publicly-traded companies, and to continue to operate, through the existing registrant (Tyco), its other two lines of businesses (Tyco Fire and Security and Tyco Engineered Products and Services) (the "Spin-Off Transaction"). Tyco's Board of Directors has concluded that separating into three businesses would be the best way to position each of these companies for sustained growth and value creation.

At the same time, Tyco sought to realign the level and mix of debt outstanding and TIGSA, the current primary obligor on the Notes, commenced a tender offer and consent solicitation asking noteholders to tender their Notes to TIGSA in exchange for cash – in an amount greater than the public market price of the Notes – and to consent to the clarification of certain provisions in the indentures governing the Notes (the "Indentures").

On its face, plaintiff's case is a simple breach of contract claim in which monetary damages are not only available but also are specified in the Indentures. As its own complaint makes plain, AIG's position is that the Spin-Off Transaction (but *not* the tender offer) will violate the Indentures and trigger a contractual obligation for TIGSA to redeem the Notes at a price higher than the tender offer price. (Compl. ¶ 7.) As a matter of law, if AIG is right (and it is not), TIGSA's alleged breach of this obligation plainly can be remedied by an award of money damages as outlined in the Indentures and, therefore, the request for preliminary injunctive relief must be denied. *See, e.g.*, *Morgan Stanley & Co. v. Archer Daniels Midland Co.*, 570 F. Supp. 1529, 1534 (S.D.N.Y. 1983) (refusing to enjoin defendant's redemption of debentures when plaintiff challenged defendant's disclosures because money damages were available). Indeed, any doubt that money damages are available here is completely dispelled by the very case on which AIG places so much reliance, *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039 (2d Cir. 1982), where the court awarded money damages, not an injunction. Undaunted by this fundamental flaw, AIG has moved for preliminary injunctive relief in a transparent effort to secure negotiating leverage to obtain a higher price (monetary relief) by seeking to disrupt the Spin-Off Transaction, claiming that TIGSA's tender offer and consent solicitation fail to disclose the alleged fact that the Spin-Off Transaction violates the Indentures.

A review of AIG's motion papers, which consist of a complaint lacking any allegation of irreparable harm, a lawyer's transmittal affidavit, and a memorandum of law, readily establishes that AIG has failed to satisfy any of the exacting standards necessary for the Court to issue a preliminary injunction enjoining TIGSA's tender offer and consent solicitation:

*First*, AIG has failed to demonstrate the risk of immediate irreparable harm – the most basic requirement for entry of a preliminary injunction. Even if AIG could establish that

TIGSA improperly solicited tender of the Notes and consent to the amendments of the Indentures by failing to disclose AIG's view that, absent the amendments, the proposed Spin-Off Transaction would violate the Indentures (although it will not), money damages are an entirely sufficient remedy. AIG's own allegations, and its own cases, demonstrate that damages for the alleged breach of the Indentures are quantifiable through the express provisions of the Indentures. (*See* Compl. ¶ 7.) Damages for any improperly induced tenders would simply be calculated pursuant to the plain terms of the Indentures.

      *Second*, AIG failed to establish a likelihood of success on the merits. Although TIGSA disputes AIG's substantive position, it has nonetheless already publicly disseminated a supplement to its tender offer and solicitation materials disclosing the existence of this lawsuit, the facts concerning the dispute as alleged by AIG, the legal authority AIG cites, and the facts AIG claims are material and previously omitted from TIGSA's consent solicitation. "Courts in this district have consistently held in the securities context that when 'a genuine and vigorous dispute exists as to whether the material which the plaintiff alleges is required to be disclosed is actually a fact,' 'the law requires only that the disputed facts and the possible outcomes be disclosed.'" *Ranger Oil Ltd. v. Petrobank Energy & Res. Ltd.*, No. 00CIV3139SHS, 2000 WL 33115906, at *12 (S.D.N.Y. May 23, 2000) (quoting *Avnet, Inc. v. Scope Indus.*, 499 F. Supp. 1121, 1125 (S.D.N.Y. 1980) and collecting cases). As a matter of law, where, as here, noteholders have sufficient information to make a rational and informed decision whether to tender their Notes, a preliminary injunction may not issue. Indeed, AIG itself concedes as much, given that it requests the Court to issue a preliminary injunction only "until Tyco makes corrective disclosures." (Pl. Br. at 3.)

3

In all events, AIG's contention that the proposed Spin-Off Transaction violates the terms of the Indentures is based entirely on the Second Circuit's decision in *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039 (2d Cir. 1982), a case that is wholly inapposite. *Sharon Steel* involved the sale of assets *to a third-party as part of a plan to completely liquidate the debtor*. By contrast, the Spin-Off Transaction here involves the continual operation by Tyco of its fire and security and engineered products and services businesses comprising 47% of the obligor's assets through a newly-formed, wholly-owned subsidiary. Indeed, *Sharon Steel* involved a complete piecemeal liquidation of the obligor culminating in a significant cash for cash exchange, a transaction that the Court of Appeals characterized as having "little functional significance other than substituting a new debtor in order to profit on a debenture's low interest rate." *Sharon Steel*, 691 F.2d at 1051. Because Tyco, through a newly-formed, wholly-owned subsidiary, will have continued ownership and operation of major businesses, it is vastly different from the *Sharon Steel* transaction, and therefore, no Indenture term prohibits TIGSA from engaging in the Spin-Off Transaction.

*Third*, AIG has not established that the balance of the hardships tips decidedly in its favor. It asserts merely that absent relief it and other noteholders will be required to respond to TIGSA's offer "without full disclosure." (Pl. Br. at 15.) Because full monetary relief can be obtained by AIG after trial, if it were successful on its disclosure claim, AIG has failed to tip the balance at all. In any event, because TIGSA has now disclosed the information AIG claims is material, this claimed hardship no longer exists. In contrast, as explained below, a preliminary injunction disrupting the tender offer or delaying the Spin-Off Transaction will cause substantial hardship to TIGSA and Tyco. Tyco and the holders of its public securities will be frustrated in implementing the strategy designed to position Tyco and the two spin-off companies for

4

sustained growth and value creation – which is exactly the mischievous result sought here by AIG.

Accordingly, for all these reasons, the Court should deny AIG's motion.

## STATEMENT OF FACTS

### A.    The Parties

TIGSA, a Luxembourg limited liability company, is a wholly owned subsidiary of Tyco, a Bermuda corporation.  TIGSA, the issuer of Tyco's public debt, is a holding company that, through its subsidiaries, operates four major lines of businesses, including (i) an electronics business, (ii) a healthcare business, (iii) a fire and security business, and (iv) an engineered products and services business.  Tyco has fully and unconditionally guaranteed TIGSA's public debt.  AIG is a New Jersey corporation with its principal place of business in New York City, New York.  AIG purports to hold Notes issued under the Indentures.

### B.    The Spin-Off Transaction

On January 13, 2006, Tyco announced that its Board of Directors had approved a plan to separate from Tyco two of its four businesses resulting in three independent, publicly-traded companies: one for its electronics businesses (Tyco Electronics); one for its healthcare businesses (Covidien); and Tyco, which would continue to own and operate its fire and security and engineered products and services businesses.  (Jenkins Decl. Ex. 1 at 23; Form S-1.)  The spin-offs will occur through tax-free dividend distributions to Tyco's shareholders of all of the common shares of entities holding Tyco's electronics and healthcare businesses, respectively. After the distributions, Tyco will continue to own and operate, through direct and indirect subsidiaries, the fire and security and engineered products and services businesses.  (*Id.*)

Prior to the distribution, TIGSA will contribute the assets and liabilities relating to its electronics businesses to Tyco Electronics Ltd. ("Tyco Electronics"), and the assets and

liabilities relating to its healthcare businesses to Covidien Ltd. ("Covidien"). These two businesses account for approximately 53% of TIGSA's total assets. (Jenkins Decl. Ex. 1 at 14; Form S-1.) Contrary to AIG's incorrect and unsupported contention that the successor obligor here will have only 27% of Tyco's present assets, the remaining 47% of TIGSA's assets, as well as the liabilities, relating to the fire and security and engineered products and services businesses will be contributed to Tyco International Finance S.A. ("TIFSA"), which is replacing TIGSA in Tyco's corporate structure.

TIFSA is a newly-formed Luxembourg holding company, established to own directly or indirectly Tyco's fire and security and engineered products and services businesses. TIGSA is being replaced with its replica, TIFSA, in Tyco's corporate structure in order to comply with requirements of Luxembourg law that will minimize transaction costs in executing the Spin-Off Transaction. TIFSA is expected to have assets of more than $29 billion and total shareholders' equity of nearly $15 billion. (Jenkins Decl. Ex. 1 at 38; Form S-1.) It is also expected to have, at most, approximately 40% of Tyco's present total debt, which after the Spin-Off Transaction is expected to be reduced from approximately $10 billion to approximately $4 billion. (*Id.*) It comes as no surprise, therefore, that AIG fails to allege that the credit ratings of the Notes will be reduced at all, much less that the holders of the Notes will incur any increased risk, following the Spin-Off Transaction.

TIFSA will also assume TIGSA's liabilities under TIGSA's indentures. After the contribution of all of its assets and liabilities, TIGSA will distribute to Tyco all of the outstanding shares of capital stock of TIFSA, Tyco Electronics, and Covidien. Tyco then will distribute the shares of Tyco Electronics and Covidien to its shareholders, while continuing to completely own and fully operate TIFSA and its fire and security and engineered products and

services businesses.   (Jenkins Decl. Ex. 2 at 6-7; Offer To Purchase and Consent Solicitation Statement.)

**C.**    **The Notes Issued Pursuant to the 1998 and 2003 Indentures**

    **1.**    **Successor Obligor Clause**

      TIGSA issued the Notes at issue in this dispute under a 1998 Indenture and a 2003 Indenture.  The 1998 Indenture includes a provision titled "Issuer and Guarantors May Consolidate, etc., on Certain Terms" and the 2003 Indenture includes a provision titled "Consolidation, Merger and Sale of Assets."  (Jenkins Decl. Ex. 3 at § 8.1, 1998 Indenture; Jenkins Decl. Ex. 4 at § 10.01, 2003 Indenture.)  Tyco fully and unconditionally guaranteed the Notes.

      The 1998 Indenture provision provides, in relevant part, that each of Tyco and TIGSA covenants that it

> will not . . . sell or convey all or substantially all of its assets to any Person, unless (i) . . . the successor entity or the Person which acquires by sale or conveyance substantially all the assets of the Issuer . . . shall expressly assume the due and punctual payment of the principal of and interest on all the Securities . . ., and (ii) the successor corporation . . . shall not, immediately after . . . such sale or conveyance, be in default in the performance of any such covenant or agreement.

(Jenkins Decl. Ex. 3 at § 8.1; 1998 Indenture.)  The applicable provision in the 2003 Indenture is substantially similar.  (Jenkins Decl. Ex. 4 at § 10.01, 2003 Indenture.)  We refer to these provisions, as does AIG, as the "Successor Obligor Clause."

    **2.**    **The Default Provision**

      The Indentures further provide, in relevant part, that should TIGSA default in the performance of any covenant or agreement, and should such default continue for 90 days after notice is given of such default, the holders of the Notes can declare both the principal and accrued interest immediately due and payable.  (Jenkins Decl. Ex. 3 at § 4.1, 1998 Indenture;

Jenkins Decl. Ex. 4 at § 6.01(b), 2003 Indenture.)  The provision in each indenture concretely

establishes the amount of monetary damages to which a noteholder is entitled should a breach of

the Indenture occur.

**D.**    **The Tender Offer and Consent Solicitation**

On April 27, 2007, TIGSA disseminated to holders of the Notes an Offer to

Purchase and Consent Solicitation Statement (Jenkins Decl. Ex. 2 at 1; Offer to Purchase and

Consent Solicitation Statement), offering to acquire all of the outstanding Notes and requesting

consents to clarify the application of certain provisions in the Indentures to the Spin-Off

Transaction.  (*Id.* at 1.)  The Offer to Purchase and Consent Solicitation Statement disclosed

information concerning the proposed Spin-Off Transaction, the purpose and background of the

tender offer and consent solicitation, the Notes themselves, the tender offer and consent

solicitation itself, and certain proposed amendments to the Indentures.  (*Id.* at 6-10.)  The tender

offer represents an offer to purchase the Notes at a premium above their principal amount and

above the market price at which the Notes traded prior to the announcement of the offer.

(Jenkins Decl. ¶ 14.)

TIGSA disclosed in the Tender Offer and Consent Solicitation extensive

information.  As an initial matter, TIGSA stated it believes that the corporate restructuring in

advance of the Spin-Off Transaction is not prohibited by the Indentures.  (Jenkins Decl. Ex. 2 at

9.)  Nonetheless, TIGSA also acknowledged that uncertainty on this issue existed, disclosing that

it thought it "desirable" to eliminate any "uncertainty" (*Id.* at ii) by amending the Indentures.

TIGSA further disclosed, as attachments titled Annex A and B to the Tender Offer and Consent

Solicitation, full verbatim copies of the proposed clarifying amendments to the 1998 and 2003

Indentures, respectively, so that any Note holder could read both proposed amendments in full.

8

(*Id.* at A1-A2; B1-B2.)  All of this information was fully disclosed to Note holders upon filing

and dissemination of the Tender Offer and Consent Solicitation.

The Tender Offer and Consent Solicitation will expire at 12:00 midnight, New

York City time, on Thursday, May 24, 2007.  Noteholders who tender their Notes and deliver

their consents before 5:00 p.m., New York City time, on May 15, 2007 will receive the

consideration offered in the tender offer, plus an early consent payment.  Those tendering after

5:00 p.m., New York City time, on May 15, 2007, but before the May 24, 2007 expiration of the

tender offer will receive the consideration offered, but not the early consent payment.  (*Id.* at 10-

11; Jenkins Decl. Ex. 5; Supplement to Offer to Purchase and Consent Solicitation.)  Noteholders

who do not tender will continue to own their Notes; those Notes will continue to be obligations

of an issuer with an investment grade rating and will continue to have the benefit of Tyco's

guarantee.

**E.    AIG Files Its Complaint And Motion For Preliminary Injunction**

On or about May 9, 2007, AIG filed its complaint in this action, alleging a

violation of Section 14(e) of the Securities Exchange Act of 1934 and seeking an injunction

against the tender offer and consent solicitation and a declaration that the Spin-Off Transaction

will violate the Indentures.  AIG further contends that the tender offer and solicitation documents

fail to disclose "the highly material information that [the Spin-Off Transaction] violates

noteholder rights" under the Indentures.  (Pl. Br. at 1.)  AIG's complaint also seeks a declaratory

judgment regarding whether the Spin-Off Transaction will violate the Indentures, but it does not

seek (and is not entitled to) a preliminary injunction on this claim.  Significantly, the complaint

does not contain a single allegation of irreparable harm or that money damages are not readily

available for any of its claims.  Indeed, the complaint appears assiduously to avoid making any such averment.

**F.    The Supplemental Disclosure to the Tender Offer and Consent Solicitation**

On May 11, 2007, TIGSA (although it rejects AIG's position) disseminated a Supplement to its Offer to Purchase and Consent Solicitation Statement disclosing extensive information about this lawsuit and the allegations contained therein, affording holders of the Notes the benefit of this additional information when deciding whether to tender their Notes, and that TIGSA had extended the date on which holders of Notes can tender the Notes and receive the early consent payment from May 10 to May 15.  (Jenkins Decl. Ex. 5; Supplement to Offer to Purchase and Consent Solicitation.)  Specifically, the supplement discloses in relevant part:

> On May 9, 2007, AIG Global Investment Corp. ("AIG"), which purports to be a holder of 2003 Notes and 1998 Notes, commenced an action against the Company in the United States District Court for the Southern District of New York.  The complaint in the action is on file with the Clerk of that court, under the case name *AIG Global Investment Corp. v. Tyco International Group, S.A.*, Case No. 07-cv-03693-SAS.

> The complaint alleges that the transfer of assets by the Company to TIFSA in connection with the Proposed Separation will not constitute a transfer of all or substantially all of the Company's assets and, therefore, that the Proposed Separation will violate the provisions of the 1998 Indenture and the 2003 Indenture because the Indentures do not permit the assignment of the Company's obligation on the Notes unless all or substantially all of the assets are being transferred.

> The complaint relies upon a case entitled *Sharon Steel Corp. v. The Chase Manhattan Bank*, 691 F.2d 1039 (2d Cir. 1982), which AIG claims supports its interpretation of the Indentures.  The complaint also asserts that the Proposed Separation violates the Indentures because the transfer of assets to Tyco Electronics and Covidien will constitute a sale of all or substantially all of the Company's assets, but without a concurrent assumption of the Notes by such entities.

> Furthermore, the complaint alleges that the Company's Offer Documents are false and misleading in that they:  represent that the transfer of the Company's assets to TIFSA as part of the Proposed Separation shall be deemed a conveyance of substantially all of the Company's assets; describe the 1998 Indenture Amend-

10

ments and the 2003 Indenture Amendments as "clarifying" the applicable provi-
sions of the Indentures, even though AIG asserts they represent a "dramatic
change from the true meaning" of the provisions of the Indentures and that the
"proposed amendments in fact effect a material change to the Successor Obligor
clauses" of the Indentures; assert that the Company believes that the various steps
in the Proposed Separation are not prohibited by the Indentures; and fail to
disclose the existence of the *Sharon Steel* decision, which AIG claims is con-
trolling, and that the Company's actions are "attempts to circumvent" the holding
of the *Sharon Steel* decision.

The Company disagrees with AIG's position, and intends to vigorously defend the
lawsuit.

(Id. at 1.)  Unquestionably, holders of the Notes now have full information concerning AIG's

complaint and the issues it raises, which they can consider when deciding whether to tender their

Notes.

## ARGUMENT

### THE COURT SHOULD REFUSE TO ISSUE A
### PRELIMINARY INJUNCTION, WHICH IS
### AN EXTRAORDINARY REMEDY GRANTED SPARINGLY

A preliminary injunction is an "'extraordinary and drastic remedy, one that should

not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Grand*

*River Enter. Six Nations Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (citation omitted).  Indeed,

as this Court has recognized, "[a] preliminary injunction is 'one of the most drastic tools in the

arsenal of judicial remedies' and should not be routinely granted." *Deal, LLC v. Korangy Pub'g,*

*Inc.*, 309 F. Supp. 2d 512, 520 (S.D.N.Y. 2004) (Scheindlin, J.) (quoting *Hanson Trust PLC v.*

*SCM Corp.*, 774 F.2d 47, 60 (2d Cir.1985)).

In seeking the extraordinary relief of a preliminary injunction, the moving party

bears the burden of proving: "'" (a) irreparable harm and (b) either (1) a likelihood of success on

the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for

litigation and a balance of hardships tipping decidedly toward the party requesting the prelim-

inary relief.""" *Maltz v. Aetna Health Plans of New York, Inc.*, 114 F.3d 9, 11 (2d Cir. 1997)

(citations omitted). For the reasons below, AIG has failed to demonstrate any of these

prerequisites. Accordingly, the Court should deny the motion for a preliminary injunction.

## I.     AIG HAS FAILED TO ESTABLISH IRREPARABLE INJURY

### A.     The Alleged Injury About Which AIG Complains Can Adequately Be Remedied by a Monetary Award

It is axiomatic that for an injury to be irreparable, it must be the kind of "injury

for which a monetary award cannot be adequate compensation." *Jackson Dairy, Inc. v. H.P.*

*Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979) (per curiam); *see also Luce v. Edelstein*, 802

F.2d 49, 57 (2d Cir. 1986) (affirming denial of preliminary injunction where "plaintiffs'

allegations implicated only the potential loss of their investment – economic injury that . . . does

not constitute irreparable harm"); *Sperry Int'l Trade, Inc. v. Gov't of Israel*, 670 F.2d 8, 12 (2d

Cir. 1982) (affirming denial of preliminary injunction to keep defendant from drawing on letter

of credit because "the potential harm to the moving party is simply a monetary loss" and such

"potential injury is normally not deemed irreparable"). This is particularly the case where the

contract purportedly in dispute itself establishes the monetary remedy available for a purported

breach of such contract. As the Court of Appeals for the Fifth Circuit has stated in language

equally applicable here:

> [W]hen parties such as [the parties here], who have drafted their own agreement,
> expressly advert to the possibility of a breach and specify the remedy as
> liquidated monetary damages--with no mention of injunction--injunctive relief is
> virtually waived. By definition, 'irreparable injury' is that for which
> compensatory damages are unsuitable, yet compensatory damages is precisely the
> remedy prescribed by Plaintiffs in the contract drafted by their counsel.

*Wildmon v. Berwick Universal Pictures*, 983 F.2d 21, 24 (5th Cir. 1992).

AIG has not established, because it cannot, the irreparable harm necessary for a

preliminary injunction. Monetary damages are both available and measurable as a remedy for

the alleged harm that lies at the heart of its complaint – that the Spin-Off Transaction will breach the Indentures. Thus, for this reason, it is not surprising that AIG has failed to allege, much less submit any evidence of, by affidavit or otherwise, irreparable harm. The reasons for this absence are clear – contract damages are a complete remedy.

   *Morgan Stanley & Co. v. Archer Daniels Midland Co.*, 570 F. Supp. 1529 (S.D.N.Y. 1983), is instructive in this regard. There, the court refused to enjoin the defendant's redemption of debentures when the plaintiff challenged the defendant's disclosures under § 10(b) because money damages were available. *Id.* at 1534-35. The court reasoned that the specific provisions of the indentures themselves provided the information necessary to determine the amount of monetary damages available to a plaintiff bondholder. *Id.*; *see also Wildmon*, 983 F.2d at 24; *E.H.I. of Fla., Inc. v. Ins. Co. of N. Am.*, 499 F. Supp. 1053, 1058-59 (E.D. Pa. 1980) (where issuer sought bondholder approval for a transaction that would affect the security for the bonds, concluding that despite the plaintiff's disclosure claims, monetary damages were available), *aff'd*, 652 F.2d 310 (3d Cir. 1981).

   Like the plaintiff in *Morgan Stanley*, AIG fails completely to establish irreparable injury – particularly considering that its motion papers are completely devoid of any allegations or sworn assertions establishing such harm – because money damages are readily available. Specifically, if AIG were ultimately to prevail here because its reading of the Successor Obligor Clause ultimately proves correct, the Indentures, like the indentures in *Morgan Stanley*, provide an adequate remedy in the form of monetary damages. Indeed, AIG itself admits as much. (*See* Compl. ¶ 7 (alleging the Indentures impose on TIGSA a "contractual obligation" to redeem the Notes at an "agreed upon price").) Consequently, if AIG is right on the merits of its claims (and it is not), it and any other Note holders who were wrongly induced to tender their Notes would

be entitled to compensation as provided under the Indentures – quintessential monetary damages. (Jenkins Decl. Ex. 2, at 2; Offer to Purchase and Consent Solicitation.)

Indeed, that money damages will suffice here is made crystal clear by the principal case on which AIG relies, *Sharon Steel*. There, the debenture holders sought and obtained a money judgment that their debentures were due and payable. To be sure, the underlying liquidation transactions in *Sharon Steel* were quite different from the Spin-Off Transaction planned by Tyco, but the fact that money damages were adequate and calculable in *Sharon Steel* is dispositive of AIG's motion for a preliminary injunction here.

### B.    AIG's Attempt To Dress Up Its Contract Claim in Section 14(e) Garb Is Unavailing

Unable to show irreparable harm, AIG seeks to dress up its pure contract claims in the garb of a Section 14(e) claim to try to bootstrap its motion to cases involving battles over imminent changes of corporate control. It is by now well established that a violation of the Williams Act "will not trigger *per se* the right to equitable relief," *Iavarone v. Raymond Keyes Assocs., Inc.*, 733 F. Supp. 727, 731 (S.D.N.Y. 1990), and mere allegations of a "material misstatement ... [are] insufficient in and of [themselves] to constitute irreparable harm." *Olesh v. Dreyfus Corp.*, No. CV-94-2909, 1994 WL 780179, at *4 (E.D.N.Y. Aug. 15, 1994); *see also Schmidt v. Enertec Corp.*, 598 F. Supp. 1528, 1543-44 (S.D.N.Y. 1984) (material omission in tender offer prospectus not sufficient to establish irreparable harm). Rather, "a tender offer should not be enjoined when the proposed transaction will not cause 'unravelable' harm which cannot be adequately calculated and compensated for by money damages." *Iavarone*, 733 F. Supp. at 731 (citing *Schmidt*, 598 F. Supp. at 1544); *see also John Labatt Ltd. v. Onex Corp.*, 890 F. Supp. 235, 248 (S.D.N.Y. 1995) (denying injunction in section 14(e) context when, *inter alia*, the plaintiff failed to demonstrate a monetary award was unavailable).

14

In attempting to overcome the complete absence of irreparable harm, AIG plays fast and loose with the case law by relying on decisions addressing tender offers for the purchase of *shares of stock involving imminent changes of corporate control*, which therefore would result in a so-called "scrambling of the eggs" and cause irreparable harm. (*See* Pl. Br. at 9-10 (citing cases).)[1] The tender offer at issue here is completely unlike the transactions involving fundamental changes in corporate control resulting in a so-called "scrambling of the eggs." Here, if TIGSA solicits sufficient consents and the proposed amendment to the Indentures is approved, AIG will still be able to challenge the disclosure later, and if successful, set it aside and seek money damages under the Indentures. *See, e.g., Schmidt*, 598 F. Supp. at 1530 (finding that exchange offer at issue "does not present a situation that will be impossible to 'unscramble' or 'unravel' once the exchange offer has expired."); *Plant Indus., Inc. v. Bregman*, 490 F. Supp. 265, 271 (S.D.N.Y. 1980) ("To allow an election to proceed in the face of allegations of improper solicitations and misleading proxy materials does not in and of itself work an

---

[1]    All of Plaintiff's cases can be distinguished on this basis. See *Consol. Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252, 261 (2d Cir. 1989) (Pl. Br. at 9) (finding irreparable harm because successful tender offer will render it "impossible for the District Court to undo the takeover after the fact"); *Gulf & Western Indus., Inc. v. Great Atlantic & Pacific Tea Co., Inc.*, 476 F.2d 687 (2d Cir. 1973) (Pl. Br. at 9) (affirming injunction *without discussing irreparable harm* involving tender offer in connection with G&W's "proposed acquisition" of A&P in which "G&W would eventually control or substantially influence the operations of A&P"); *E.ON AG v. Acciona S.A.*, 468 F. Supp. 2d 537 (S.D.N.Y. 2006) (Pl. Br. at 10) (tender offer "in the context of a battle between European companies for control of Spain's largest electrical utility, Endesa, S.A."); *American Insured Mortgage Investors v. CRI, Inc.*, No. 90 Civ. 630 (MBM), 1990 WL 192561, at *20 (S.D.N.Y. Nov. 26, 1990) (Pl. Br. at 10) (examining tender offer "in corporate control contests"). Here, however, Tyco's tender offer does not involve a change of corporate control transaction at all. Indeed, the primary case on which Plaintiff relies on this point concerning irreparable harm, *Sonesta International Hotels Corp. v. Wellington Associates*, 483 F.2d 247 (2d Cir. 1973), has been severely criticized, and has been found by courts to be no longer persuasive. *See, e.g., Olesh*, 1994 WL 780179, at *4 ("More recent authority in the Circuit has questioned the continued viability of the *Sonesta* holding."); *Ryan v. VHA Enters., Inc.*, 1990 WL 58969, at *5 (S.D.N.Y. May 1, 1990) (refusing to enjoin scheduled shareholder meeting for alleged proxy fraud and stating that "an examination of the *Sonesta* opinion indicates that the continued viability of its holding is seriously in doubt").

irreparable injury on the party challenging the materials.  This Court possesses the power, if

necessary, to void the election, order re-solicitations and otherwise 'unscramble' this kind of

transaction."); *Freer v. Mayer*, No. 91 Civ. 2519, 1991 WL 355062, at *5 (S.D.N.Y. Apr. 26,

1991) (refusing to enjoin annual meeting at which shareholders would elect board members,

despite allegations of incomplete disclosures regarding nominees; concluding: "if the proxies are

ultimately in violation of the securities law, this court has the power to set aside the election").

Accordingly, because monetary damages are readily available, AIG cannot show

irreparable harm, even if the Court finds any tenders improper.  Therefore, the Court should deny

the motion for preliminary injunction on this basis alone.

## II.    AIG HAS FAILED TO ESTABLISH ANY
LIKELIHOOD OF SUCCESS ON THE MERITS

### A.    By Disclosing the Claims Made by AIG, TIGSA Has Disclosed
What AIG Contends The Solicitation Materials Omitted,
And TIGSA Has Extended The Early Consent Deadline,
Thus Permitting Noteholders Time to Absorb This Information

TIGSA solicited Noteholders to consent to amend the Indentures to eliminate any

doubt about the propriety of the Spin-Off Transaction.  If the solicitation succeeds, it will moot

the disagreement over the Successor Obligor Clause.  In this regard, therefore, TIGSA has

amended its tender offer and solicitation materials to fully disclose the existence and nature of

the dispute over whether the Spin-Off Transaction would violate the terms of the Successor

Obligor Clauses.  TIGSA is required to do no more:

> Courts in this district have consistently held in the securities context that when 'a
> genuine and vigorous dispute exists as to whether the material which the plaintiff
> alleges is required to be disclosed is actually a fact,' 'the law requires only that
> the disputed facts and the possible outcomes be disclosed.

*Ranger Oil*, 2000 WL 33115906, at *12 (S.D.N.Y. May 23, 2000) (quoting *Avnet, Inc. v. Scope*

*Indus.*, 499 F. Supp. 1121, 1125 (S.D.N.Y. 1980) and collecting cases); *see also Mgmt.*

*Assistance Inc. v. Edelman*, 584 F. Supp. 1021, 1032 (S.D.N.Y. 1984) ("Disclosure of the

allegations in pending litigation that are material to the issues involved in the proxy contest is all

that is required."); *Telenor East Invest AS v. Eco Telecom Ltd.*, No. 05 Civ. 7584, 2005 WL

2239999, at *3 (S.D.N.Y. Sept. 7, 2005) (denying injunction when disputed facts were disclosed);

*Bally Total Fitness Holding Corp. v. Liberation Invs., L.P.*, No. Civ. A. 05-841-JJF, 2005 WL

3525679, at *1 (D. Del. Dec. 22, 2005) (concluding that disclosure of disputed facts "cure[d] the

alleged defect"; finding no irreparable harm); *Telex Corp. v. Edelman*, No. 87-C-873-E, 1987

WL 43390, at *4 (N.D. Okla. Nov. 5, 1987) (finding no likelihood of success when dispute was

disclosed); *Revlon, Inc. v. Pantry Pride, Inc.*, 621 F. Supp. 804, 812-13 (D. Del. 1985) (same).

      In *City Capital Associates L.P. v. Interco, Inc.*, 696 F. Supp. 1551 (D. Del.), *aff'd*,

860 F.2d 60 (3d Cir. 1988), for example, the court explained: "A tender offeror should not be

placed in a position of being forced to either admit liability, while he or she disputes it, or violate

the securities law by failing to disclose the alleged and disputed violation." *Id.* at 1557. By

acknowledging the dispute raised by AIG, even while disputing its merits on the facts and the

law, TIGSA has provided each Note holder with "sufficient information to make a rational and

informed decision whether to tender his or her" Notes. *Id.*   And so long as the Note holders are

adequately informed, there is no irreparable harm in allowing them to decide whether to tender

their Notes. *See, e.g., Ranger Oil*, 2000 WL 33115906, at *12 (finding no irreparable harm in

tender offer context where relevant dispute was disclosed).

    **B.**    **AIG's Sole Reliance On *Sharon Steel***
                 ***Corp.v. Chase Manhattan Bank* Is Misplaced**

      In all events, there is nothing at all in the Indentures that precludes Tyco or

TIGSA from engaging in the Spin-Off Transaction. On this point, AIG's reliance on *Sharon

Steel* for its argument that the Spin-Off Transaction will violate the Indentures is completely

misplaced. (Pl. Br. at 11-14.) On its face, *Sharon Steel*, which involves a sale of assets to a third-party as part of a *liquidation* of the corporation, has no application to the Spin-Off Transaction here. The Court of Appeals itself explicitly emphasizes this critical distinction in its holding:

> We hold, therefore, that boilerplate successor obligor clauses do not permit assignment of the public debt to another party *in the course of a liquidation* unless "all or substantially all" of the assets of the company at the time the plan of liquidation is determined upon are transferred to a single purchaser.

*Sharon Steel*, 691 F.2d at 1051 (emphasis added). Indeed, the Court of Appeals in *Sharon Steel* itself cautioned against literal application of successor obligor clauses, and made plain that the nature of the transactions at issue must be viewed in their entirety and against the backdrop of the purpose of the Successor Obligor Clause, which is, among other things, to preserve assets to support repayment of the debt. *Id.* at 1049 ("[A] literal reading of the words 'all or substantially all' is not helpful apart from reference to the underlying purpose to be served.").

Here, AIG urges a strictly literal reading of the Successor Obligor Clauses and ignores entirely the nature of the Spin-Off Transaction, which is readily distinguishable from the liquidation at issue in *Sharon Steel*. In *Sharon Steel*, the obligor truly did liquidate, selling all of its operating assets to third parties in a series of transactions for cash to be distributed to its shareholders. *Id.* at 1045-46. None of the assets that the obligor possessed at the start of its plan of liquidation remained after the final transaction. Therefore, according to the court, the holders of the indenture securities in *Sharon Steel* were harmed by the transaction. That final transaction, the sale of the obligor's remaining assets to Sharon Steel, was largely a cash for cash exchange that the court held to have little functional significance other than substitution of a new obligor seeking to profit on the debentures' low interest rates. *Id.* at 1046-48. The court understood that

18

the principals were attempting to avoid the application of the indentures in order to strip assets that should have remained available to support the indenture securities.

To the contrary, the proposed Spin-Off Transaction here is not a true liquidation. Instead, it is a corporate reorganization in which two of TIGSA's operating businesses will be spun-off to shareholders and the other two, comprising almost half of TIGSA's assets, will remain in operation with the same ownership. Notably, the Indentures do not prohibit a spin-off of businesses to shareholders, and the spin-offs will not be a disposition of substantially all of TIGSA's assets. TIFSA will retain 47% of TIGSA's operating assets. (Jenkins Decl. Ex. 1 at 14; Form-S1); *see Bacine v. Scharffenberger*, No. 7862, 1984 WL 21128, at *3 (Del. Ch. Dec. 11, 1984) (sale of assets responsible for up to 53% of the company's net income was not a sale of substantially all assets); *Oberly v. Kirby*, 592 A.2d 445, 464 (Del. 1991) (sale of 80% of company's assets was not a sale of all or substantially all assets).

In executing the Spin-Off Transaction, TIGSA will be replaced in the Tyco corporate structure by a newly-formed Luxembourg subsidiary, TIFSA, a replica of TIGSA, which will liquidate after transferring its assets and liabilities to TIFSA. This final step is by no means comparable to the obligor's liquidation in *Sharon Steel*, and to regard it as such would be to elevate form over substance. TIGSA and TIFSA both have the same owner, Tyco (the public parent), Tyco remains the guarantor of the Notes, and TIFSA will continue to operate exactly the same fire and security and engineered products and services businesses as TIGSA had been operating. As the Form S-1 makes clear, TIFSA will have approximately 47% of the assets now held by TIGSA, and its parent Tyco will assume 27% of certain its current contingent liabilities. (*See* Jenkins Decl. Ex. 1 at 14; Form-S1.) TIFSA will have $29 billion in assets, and shareholders' equity of nearly $15 billion and total debt of less than $4 billion (as opposed to the

current $10 billion). (*Id.* at 38.) It comes as no surprise, therefore, that AIG fails to allege that the credit ratings of the Notes will be reduced at all, much less the holders of the Notes will incur any increased risk, following the Spin-Off Transaction.

In this context, the *ratio decidendi* of the Second Circuit's decision in *Sharon Steel* is completely absent:

> Accepting Sharon's position, however, would severely impair the interests of lenders. Sharon's view would allow a borrowing corporation to engage in a piecemeal sale of assets, with concurrent liquidating dividends to that point at which the asset restrictions of an indenture prohibited further distribution.

*Sharon Steel*, 691 F.2d at 1051. Any doubt that the kind of transaction addressed in *Sharon* differs radically from the "degree of continuity" provided to Note holders in the Spin-Off Transaction is dispelled by the Court which described the transaction at issue in *Sharon Steel* as follows:

> Such a transaction diminishes the protection for lenders in order to *facilitate deals with little functional significance other than substituting* a new debtor in order to profit on a debenture's low interest rate.

*Id.* (emphasis added). Given the vastly different transactions, *Sharon Steel* simply has no application here, and AIG's reliance on it is misplaced.

## III. AIG HAS FAILED TO ESTABLISH THAT THE BALANCE OF HARDSHIPS TIPS DECIDEDLY TOWARD IT

AIG's assertion that, should the Court enjoin the tender offer, the balance of hardships tips "decidedly in favor of granting the injunction" should be summarily rejected. (Pl. Br. at 15.) In balancing the hardships, AIG relies completely on its conclusory allegation that it will suffer hardship if it is "forced to respond to the Tender Offer without full disclosure." (*Id.*) This assertion is woefully insufficient in light of TIGSA's recent supplemental disclosure to Note holders in connection with the tender offer, which fully informs them of AIG's action and the basis for its claims, including AIG's arguments regarding *Sharon Steel*. (*See* Jenkins Decl.

Ex. 5, at 2; Supplement to Offer to Purchase and Consent Solicitation.)  Additionally, TIGSA's

supplemental disclosure informed Note holders that the early consent deadline has been extended

until May 15, 2007, which will allow the noteholders time to absorb this additional information

when weighing the tender offer.  With this additional disclosure, TIGSA has removed the

entirety of AIG's alleged hardship.  (*Id.* at 1.)

    The hardship of an injunction to TIGSA, however, would be severe.  The

planning and preliminary implementation of the Spin-Off Transaction has been underway for

nearly 18 months, and TIGSA and its advisors have devoted thousands of hours, and nearly 200

million dollars, towards bringing it about.  (Jenkins Decl. ¶ 10.)  Tyco and its four business lines

and their employees are not the only ones that would be materially and adversely affected if

Plaintiff were to succeed in this case.  Tyco is one of the largest companies listed on the New

York Stock Exchange, with a market capitalization of $65 billion.  The public markets have been

expecting the separation since it was announced, and the uncertainty of the Spin-Off

Transaction's timing and effect have weighed down the market price of Tyco's securities.

Indeed, market analysts have recently opined that "[u]ncertainty surrounding the timing and

mechanics of [Tyco's] breakup has been a key concern for the market and probably explains a

substantial amount of the valuation delta between the stock's current price and our $35 base case

view."  (Sacca Decl. Ex. A at 6; Morgan Stanley Research Report; *see also* Sacca Decl. Ex. B at

13; UBS Investment Research Report ("We believe a key risk to [Tyco's] stock is the potential

for further delay in the separation process.").)  Clearly, the harm to TIGSA, Tyco, and their other

security holders far outweighs any conceivable harm to AIG.

## CONCLUSION

For the reasons discussed above, the Court should deny AIG's motion for a

preliminary injunction.

Dated: New York, New York
       May 13, 2007

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP

/s/Joseph N. Sacca
Jonathan J. Lerner (JL-7117)
Joseph N. Sacca (JS-9435)
Four Times Square
New York, New York 10036
(212) 735-3000

*Of Counsel*:

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Thomas J. Nolan
Peter B. Morrison (PM-5062)
300 S. Grand Ave.
Los Angeles, CA 90071
(213) 687-5000

22